[PHILADELPHIA, FEBRUARY 17, 1834.]

## FRITZ *against* HOCKER.

### APPEAL.

The meditation and concealment by a grantee, at the time of the execution of the deed, of an impracticable plan of acquiring the property which is the subject of the grant, and afterwards refusing to perform the agreement which was the consideration of it, and subsequently acting in pursuance of such plan, are not such a fraud as will produce a recision of the contract, and prevent the grantee from recovering in ejectment against the grantor.

THIS was an ejectment originally brought in the Court of Common Pleas of *Montgomery* county, by *Peter Fritz* against *Christopher M. Hocker*, for a tract of land and marble quarry, with the buildings thereon, situate in *Whitemarsh* township, in the county of *Montgomery*, containing twenty acres forty perches, an equal undivided moiety of which the plaintiff claimed under a deed executed to him by the defendant, in *May*, 1829.

The cause was removed by the defendant by *habeas corpus cum causa*, to the Circuit Court, where it was tried before ROGERS, J. in *July*, 1833.

On the trial, the defendant proposed to give evidence that the consideration of the conveyance under which the plaintiff sought to recover had totally failed, and that there was fraud on his part in procuring it. To reach this result, he offered in writing, to prove the following train of circumstances:

" The parties are half brothers; the defendant is the elder; he was a marble mason in the city of *Philadelphia*, and the plaintiff served his time with him. The plaintiff became of age in the month of *February*, 1823, and was entitled to a small sum of money. The defendant had a large stock, and was engaged in extensive business. The defendant took the plaintiff into co-partnership on equal terms, allowing him a credit for the principal part of the share of the stock, which was brought by the defendant into the concern. This partnership continued until *March*, 1826, when it was dissolved by mutual consent. The stock was valued, and the defendant permitted the plaintiff to take the whole of it at a valuation. The defendant in the mean time, had become the proprietor of the marble quarry and farm. The contract for it was made in the month of *February*, 1826, and it was consummated by the actual conveyances, dated, *April* 1, 1826. The consideration for the whole was fifteen thousand four hundred dollars. Of this, seven thousand and four hundred dollars were paid in cash, and a bond and mortgage executed for the balance of eight thousand dollars, which were afterwards discharged, the money for the purpose being raised by giving a bond and mortgage to a third person, viz., *Henry Beckett*, on the first of *May*, 1827. The mort-

(Fritz *v.* Hocker.)

gage was executed by *Christopher M. Hocker* alone, but the accompanying bond was the joint obligation of *C. M. Hocker* and *Peter Fritz,* the latter being in no respect concerned in the purchase of the quarry.

" Between the 17th of *May,* 1826, and the 18th of *December,* of the same year, the plaintiff purchased of the defendant on a credit, marble from the quarry to the amount of three hundred and twenty-seven dollars, and between *April* 2nd, 1827, and the 13th of *December,* 1827, he purchased in like manner, to the amount of one thousand and forty-three dollars and thirty-five cents. Between the 19th of *March,* 1828, and the 24th of *December,* 1828, he purchased, in like manner to the amount of two thousand four hundred and fifteen dollars and fifty-five cents; and also, between the 19th of *May,* 1828, and *October* 30th, in the same year, he purchased in like manner, to be appropriated to the building of *Arch* Street Theatre, to the amount of eight hundred and thirty-seven dollars and twenty-five cents, making an aggregate at the end of the year 1828, of four thousand six hundred and forty-three dollars and sixty-five cents.

" In the beginning of *January,* 1829, *Hocker* pressed, through his counsel, the payment of this debt, and on the sixth of the same month, the plaintiff, through his counsel, communicated to *Hocker,* a threat that he would take immediate steps to absolve himself from the responsibility incurred on account of *Henry Beckett.*

" On the 15th of *January,* 1829, the defendant entered a lien against the *Arch* Street Theatre,—*Peter Fritz* being made defendant, and sued out a *scire facias* thereon.

" Immediately afterwards, the plaintiff began to urge the defendant to enter into a co-partnership, having for its objects the marble quarry of the defendant, and the marble yard and the business of the plaintiff in the city. He frequently urged the large business that could be carried on ; the great advantage which would arise from it; his extent of work actually engaged ; the great contracts which he was about to make, among the rest, representing that he was to have one half the building of the Mint of the *United States,* and the large quantities of marble that would be wanted for it. For a considerable time, the defendant remained unmoved by these importunities, and refused to enter into the co-partnership. He at length, however, consented, and agreed to become the partner of the plaintiff, under certain terms, which were to be reduced to writing. *P. Fritz* estimated his stock at twelve thousand dollars, and stated that he had ten thousand dollars worth of work engaged. In expectation of enjoying a share of these advantages, and of the contracts to be made, the defendant agreed to put the one half of the quarry at a price greatly below its value, to wit, seven thousand five hundred dollars. But it was distinctly understood by him, that the co-partnership was to be permanent in its duration, extensive in its operations, and to be the means of affording to the defendant a vent for his marble, without imposing on him the necessity of seeking for it, and a place of deposit

(Fritz v. Hocker.)

in *Philadelphia*, under the care of a party interested, in whose fidelity, reliance might be placed. The arrangement was carried into effect in the month of *May*, and the deed was signed and articles of co-partnership were executed, the whole forming one transaction, and being necessarily connected with each other. The defendant carried the arrangement into effect, in perfect good faith. He used the joint names of himself and P. *Fritz*, in the sales of marble. He styled the quarry and the teams the property of *Hocker & Fritz*, and he firmly intended to consider and treat his co-partner as such in all the transactions which might take place. No part of the purchase money having been paid at the time, the deed, &c. were signed, and the defendant repeatedly sent to the plaintiff for money. He received for answer, inquiries concerning the record of the deed, and intimations that no money would be paid until the deed was recorded, which was in the defendant's hands. The defendant then recorded the deed, and sent again for the money, when for the first time, the plaintiff declared that he owed him none. He was now brought to believe that improper designs were harboured by the plaintiff, relative to the co-partnership, and he immediately received the deed from the office of the Recorder, and continued, as he still does, to retain it. Not long afterwards, he came to *Philadelphia*, and inquired why the name of the firm, as agreed on, had not been put up at the marble yard. He was informed by the plaintiff, that he never would put it up, and it never was his intention to put it up. The defendant received no part of the proceeds of sales at the yard, and no share of the advantages of any contracts which were made by the plaintiff. In the month of *August*, 1829, the plaintiff entered into a contract to supply the material and do the marble work of the northern half of the *United States* Mint; but it was not made known by the plaintiff to the defendant. On the contrary, the plaintiff, with a view to deprive him of the advantage of the contract, and to reserve it altogether for himself, on the 18th of *February*, 1830, dissolved the co-partnership without the consent of the defendant, and himself published the dissolution, and then immediately proceeded to complete the work for the Mint, which resulted in an operation to the extent of about from thirty to forty thousand dollars. During the period when the defendant believed the partnership to exist, the plaintiff received marble from the quarry to the amount of one thousand four hundred and seventy dollars and forty-five cents.

"Immediately after the said dissolution, *Peter Fritz* having himself in vain endeavoured to procure and purchase marble at the quarry, instigated his brother *Frederick*, to make purchases, which he accordingly did, beginning with the 9th of *April*, 1830, and continued until he reached an amount of upwards of eight thousand dollars, of which a small portion only was paid for, leaving upwards of seven thousand dollars still unpaid for. A part of this marble was handed over from time to time to *Peter Fritz*, and on the 19th of *January*, 1832, he assigned the whole of what he had on hand,

together with his real estate, to *Peter Fritz*, who was then his debtor. An appraisement was made according to law, of the stock thus assigned, and it was valued at two thousand nine hundred and forty-eight dollars and twenty-eight cents.   It was exposed to sale by the assignee, and so improperly and unfairly conducted, that persons desirous of purchasing, had no opportunity to do so; and *Peter Fritz* purchased in the whole, (excepting thirty-four dollars and fifty cents' worth,) for one thousand seven hundred and sixty-four dollars and sixty-four cents, it being put up and sold in lots.    No account has ever been settled by *Peter Fritz* as assignee.   *Frederick Fritz* applied for the benefit of, and was dicharged under the insolvent law, in the spring of 1832.    At the time of his hearing, the plaintiff, as a witness, swore that *Frederick* had not the capacity for carrying on business; and very soon after his discharge, he reinstated him in the same yard, with the same marble for sale, and the word, " agent," was added to the name of *Frederick Fritz*, on the sign which had previously been there.    The whole course of proceedings on the part of the plaintiff, was conducted and carried on with a view to circumvent the defendant, and without any serious design on his part, in good faith to form a partnership, but with the appearance and promise of it, to procure a title to one half of the marble quarry.    And by the dissolution of the partnership, and non-payment of the purchase money, the consideration has failed.

" By the articles of co-partnership, the defendant was exclusively to take charge of, and attend to the quarry,—quarrying and selling of marble, and delivering of the same.    An action of partition has been brought, and is recently discontinued by the plaintiff.    An action of detinue for the deed, was brought by the plaintiff, and is also discontinued.    An action of account render, was also brought by the plaintiff, and is now depending before arbitrators."

The whole of the evidence thus offered on behalf of the defendant was rejected by the court, and the jury found a verdict for the plaintiff, for " one undivided half part of twenty acres and forty perches," being the premises in the declaration mentioned, with six cents damages and six cents costs.

Motions in arrest of judgment, and for a new trial, were then made on the part of the defendant, for which the following reasons were filed :

### Reasons in arrest of judgment:—

1. That the verdict is for an undivided half part of twenty acres and forty perches; whereas, the declaration is for twenty acres and forty perches of land.

2. That the judgment is for the plaintiff, whereas, it should have been for the defendant.

### Reasons for a new trial:—

1. That the court rejected evidence which was offered by the

defendant, as set forth in the paper hereto annexed, and rejected every part thereof.

2. That the court decided, that the facts, circumstances, and allegations, set forth in the said paper, were insufficient, if fully proved, to prevent the plaintiff from obtaining a verdict.

3. That the court decided, that the facts proved by the plaintiff, were sufficient to entitle him to a verdict, and that his right would not be interfered with by any proof of the circumstances, or any of them, which are set forth in the paper above referred to.

4. That the defendant was entitled to give evidence of fraud and circumvention, and failure of consideration, as set forth in the said paper. But the court refused to permit such evidence to be given.

5. That no actual ouster was proved by the plaintiff, so as to entitle him, as a tenant in common, to maintain an ejectment against his co-tenant in common.

6. That the verdict is for an undivided half part, while the declaration is for twenty acres and forty perches of land.

7. That the verdict is for the plaintiff, while it should have been for the defendant.

These motions having been overruled, the defendant appealed to the court in bank, where the same reasons which had been relied upon in the Circuit Court, on the motions in arrest of judgment and for a new trial, were filed in support of the appeal.

After argument by *P. A. Browne* and *J. R. Ingersoll,* for the appellant, *Kittera,* for the appellee, was relieved by the Court, whose opinion was delivered by

GIBSON, C. J.—As there was ample evidence of delivery as well as of an ouster of the grantee, and as it has already been ruled in a case like the present, that the plaintiff may recover according to his title, it but remains to be determined, whether the proposed evidence of fraud was sufficient to set aside the conveyance in equity. There was no allegation of fraud appearing from the intrinsic nature of the contract; for the consideration which is usually the test of that, appears to be a reasonable one : nor from the condition of the parties; for they stood in the relation of brothers of mature age, free from the pressure of necessities, and labouring under no apparent infirmity; nor from the nature or circumstances of the transaction, as being a fraud upon others; for none but the immediate parties were concerned in it, either in interest or feeling. If there was fraud at all, then, it must have arisen, according to the classification of Lord HARDWICKE, in *Chesterfield* v. *Jansen,* from circumstances of actual and positive imposition. In what do these consist ? They consist, said the same great authority, in the suggestion of a falsehood, or the suppression of a truth. What, then, is the suggestion or suppression contained in the evidence of circumstances rejected? The parties were partners when the defendant purchased on separate account the marble quarry, which is the subject of the action, the purchase money being raised by a loan on the credit of both.

(Fritz *v.* Hocker.)

The partnership being dissolved, the plaintiff being pressed for payment of a heavy balance to the defendant, gave notice of measures meditated by him to release himself from responsibility as the surety of the defendant. So far, there is no pretence of fraud. The dispute was merged in a new partnership, by which the defendant became jointly interested with the plaintiff in his business as a marble mason, and the plaintiff became, for a consideration to be paid in money, a joint proprietor of the quarry, which was conveyed on terms by which the defendant was to superintend the working of it, while the plaintiff was to superintend the sales at the yard in *Philadelphia.* On being pressed for his share of the purchase money, the plaintiff denied the partnership, his own indebtedness, kept exclusive possession of the yard, and set the defendant at defiance. This is the whole case; for the subsequent credit surreptitiously obtained by the plaintiff, has no connexion with the conveyance. The gist of the supposed fraud, then, is in the concealment of an imputed plan of acquiring the property, and refusing to perform the agreement which was the consideration of it. But this plan, if it really existed,—and it can be inferred only from subsequent acts—was an impracticable one, for the law would compel him to perform his agreement, whatever his determination in respect to it might have been. No one would contend that, to deny the execution of a bond or mortgage given for purchase money, would entitle the vendor to a recision of the conveyance: yet what, in principle, is the present case, beside? *Chesterman* v. *Gardner*, 5 *Johns. Ch. R.* 33, was a much stronger case, even than that; for there subsequent acts of the defendants, in respect of which the law had provided neither guard nor remedy, were found to have put the plaintiff in a condition of jeopardy, which he certainly had not anticipated, but which nevertheless may have been meditated by the defendants at the execution of the deed. The case was this. The owner of a mortgage, who, together with the owner of the equity of redemption, had leased the premises for a term of years with covenant for quiet enjoyment, assigned the mortgage to one who procured a decree of foreclosure and sale, the lessee becoming the purchaser, and depriving himself of recourse to the covenant by merging his term in the fee. His bill to compel the lessors to account with him for the loss sustained by being deprived of the benefit of his lease, was dismissed, because, as the chancellor said, the fraud which is to afford relief, means fraud at the execution of the deed; and that the cases on the subject do not refer to subsequent and distinct transactions, which do not affect or impair the good faith which was felt and intended when the conveyance was executed. It is true the lessee had voluntarily relinquished the security of his covenant; but even that circumstance reduces the case but to the principle of the one at bar: and it may safely be asserted, that the meditation of a fraud which is incapable of consummation, is no ground for a recision of the contract.

Judgment affirmed.